## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BENJAMIN FLEENER, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | Civil Action No. 1:12-CV-563 |
| v. | § § | |
| MARTIN HANAKA, ROBERT E. ALLEN, THOMAS BERGLUND, ROBERTO BUARON, THOMAS G. HARDY, GLENDA FLANAGAN, JAMES GROVER, MARVIN E. LESSER, JAMES LONG, EMILIO S. PEDRONI, ATLANTIC EQUITY PARTNERS III, L.P., GOLFSMITH INTERNATIONAL HOLDINGS, INC., GOLF TOWN USA HOLDINGS, INC. and MAJOR MERGER SUB, INC., | § § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

### CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of the public stockholders of Golfsmith International Holdings, Inc. ("Golfsmith" or the "Company") against Golfsmith's Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties arising out of their attempt to sell the Company to Golf Town USA Holdings, Inc. ("Golf Town"), a subsidiary of OMERS Private Equity, Inc. ("OMERS"), by means of an unfair process and for an unfair price.  Additionally, Plaintiff, individually, brings a claim against Defendants for their violations of Sections 14(c) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Golfsmith is a specialty retailer of golf equipment and related apparel and accessories. The Company operates as an integrated multi-channel retailer, offering its customers the convenience of shopping in 85 retail locations across the United States through its Internet site and from its assortment of catalogues.

3.     Atlantic Equity Partners III, L.P. ("AEP") is an investment fund that controls a majority ownership interest in the Company, currently owning approximately 52.9% of the Company's outstanding common stock. In addition, five of the Company's ten directors are currently affiliated with AEP, and one other director was formerly affiliated with AEP.

4.     On May 14, 2012, Golfsmith and Golf Town announced a definitive agreement dated May 11, 2012 (the "Merger Agreement"), under which Golf Town, through its wholly-owned subsidiary, Major Merger Sub, Inc. ("Merger Sub"), will acquire all of the outstanding shares of Golfsmith for $6.10 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $96 million.

5.     The Proposed Transaction, however, is unfair to Golfsmith shareholders, and is being consummated at an unfair price that undervalues the Company. The Board entered into the Proposed Transaction for the benefit of AEP and to the detriment of the Company's minority public shareholders, when AEP had a significant interest in liquidating their interest in Golfsmith prior to September 28, 2012. The Board's decision to place the interests of AEP, and their own interests due to their affiliation with AEP, above the interests of the Company's minority public stockholders constitutes a breach of their fiduciary duties.

6.     In addition to the benefits procured for AEP, the Proposed Transaction will also result in very lucrative arrangements for the Company's officers, described in more detail below, including: (a) employment arrangements for executive officers Martin Hanaka ("Hanaka"), Sue

Gove ("Gove"), Steve Larkin ("Larkin") and Eli Getson ("Getson") in the post-merger entity; (b) the opportunity for certain of the Company's officers to invest in the equity interests of the post-merger company; and (c) the automatic vesting of unvested stock options held by the Company's officers.

7.      The adoption of the Merger Agreement required the affirmative vote or written consent of the holders of a majority of the Company's issued and outstanding shares of Common Stock. On May 11, 2012, AEP (which had temporarily dropped below a 50% ownership stake), Hanaka, and Gove, together owning approximately 51.1% of the Company's issued and outstanding shares of common stock on such date, each delivered a written consent adopting the Merger Agreement, among other things. As a result, no further action by any other Golfsmith stockholder is required to adopt the Merger Agreement or to authorize the transactions contemplated thereby. AEP is using its voting control to attempt to force the sale of Golfsmith to Golf Town for its own objectives at an unfair price without affording Golfsmith's minority shareholders any opportunity to vote on the transaction.

8.      In addition, on June 4, 2012, Golfsmith filed a Schedule 14C Information Statement (the "Information Statement") in connection with the Proposed Transaction. The Information Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an informed decision on whether to seek appraisal.

9.      The Individual Defendants and AEP have violated the federal securities laws and breached their fiduciary duties of loyalty, candor, due care, independence, good faith and fair dealing, and Golfsmith, Golf Town and Merger Sub have aided and abetted such breaches by Golfsmith's officers and directors. Plaintiff seeks to enjoin the Proposed Transaction or, in the

event the Proposed Transaction is consummated, to recover damages resulting from the defendants' violation of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## JURISDICTION AND VENUE

10.     This civil action alleges violations of Section 14(c) of the Exchange Act and Rule 14c-6 promulgated thereunder by the Securities and Exchange Commission (the "SEC"). Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's federal securities claim as a civil action arising under the laws of the United States. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are joined with the substantial and related Securities Act claim, and because Plaintiff's claims arise out of a common nucleus of operative facts.

11.     Venue is proper in this Court because the conduct at issue took place and had an effect in this county. Venue is proper in this Court pursuant to 28 U.S.C.A. §1391(a) because: (i) Golfsmith maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting in violation of the fiduciary duties owed to Golfsmith occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Golfsmith.

13.     Golfsmith is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 11000 North IH-35, Austin, Texas 78753-3195.   Golfsmith may be served with process by serving its registered agent, The Corporation Trust Company, at 1209 Orange Street, Wilmington, Delaware 19801.

14.     Defendant Martin Hanaka ("Hanaka") has been the Chief Executive Officer of the Company since 2008, and Chairman of the Board and a director of the Company since 2007. Hanaka may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

15.     Defendant Robert E. Allen ("Allen") has been a director of the Company since 2008.   Allen may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

16.     Defendant Thomas Berglund ("Berglund") has been a director of the Company since 2007.   Berglund has been a Managing Director of First Atlantic Capital, Ltd. ("First Atlantic Capital") since 2004. First Atlantic Company is the management company of AEP, an investment fund that controls a majority ownership interest in the Company. As of June 2012, AEP owned approximately 52.9% of the Company's outstanding common stock.   Berglund may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

17.     Defendant Roberto Buaron ("Buaron") has been a director of the Company since 2002. Buaron has been the Chairman, President and Chief Executive Officer of First Atlantic Capital since he founded the firm in 1989.   Buaron may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

18.     Defendant Thomas G. Hardy ("Hardy") has been a director of the Company since 2002. Hardy served as an operating partner for an affiliate of First Atlantic Capital between August 2004 and January 2009.  Hardy may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

19.     Defendant Glenda Flanagan ("Flanagan") has been a director of the Company since 2006.  Flanagan may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else she may be found.

20.     Defendant James Grover ("Grover") has been a director of the Company since 2002. Grover joined First Atlantic Capital in 1998 and has been a Managing Director since 2007. Grover may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

21.     Defendant Marvin E. Lesser ("Lesser") has been a director of the Company since 2006.  Lesser may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

22.     Defendant James Long ("Long") has been a director of the Company since 2002. Long has been a Senior Advisor for First Atlantic Capital since January 1, 2005.  Long may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

23.     Defendant Emilio S. Pedroni ("Pedroni") has been a director of the Company since 2009.  Pedroni has been with First Atlantic Capital since 2003 and has held the position of Principal since March of 2007.  Pedroni may be served with process at 11000 North IH-35, Austin, Texas 78753, or wherever else he may be found.

24.     Defendants referenced in ¶¶ 14 through 23 are collectively referred to as Individual Defendants and/or the Board.

25.     Defendant AEP is a Delaware limited partnership that may be served with process by serving its registered agent, Corporation Service Company, at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

26.     Defendant Golf Town is a Delaware corporation with its head office located at 90 Allstate Parkway, Suite 800, Markham, ON L3R 6H3. Golf Town is a specialty golf equipment, apparel and accessories retailer. The company is Canada's largest golf retailer and expanded into the U.S. market in 2011 by opening 6 stores in the greater Boston area. Golf Town and its affiliates were acquired by OMERS Private Equity Inc. ("OMERS") in September 2007.  Golf Town may be served with process by serving its registered agent, The Corporation Trust Company, at 1209 Orange Street, Wilmington, Delaware 19801.

27.     Defendant Merger Sub is a Delaware corporation wholly-owned by Golf Town that was created for the purposes of effectuating the Proposed Transaction.  Merger Sub may be served with process by serving its registered agent, The Corporation Trust Company, at 1209 Orange Street, Wilmington, Delaware 19801.

**INDIVIDUAL DEFENDANTS' AND AEP'S FIDUCIARY DUTIES**

28.     By reason of Individual Defendants' positions with the Company as officers and/or directors, and by reason of AEP's control of Golfsmith, the Individual Defendants and AEP are in a fiduciary relationship with Plaintiff and the other public shareholders of Golfsmith and owe them, as well as the Company, a duty of good faith, fair dealing, loyalty and full, candid and adequate disclosure. Moreover, where, as here, the directors and/or officers of a publicly traded corporation undertake a transaction that will result in a change in corporate control, the

directors and controlling shareholder have an affirmative fiduciary obligation to obtain the highest value reasonably available for *all* of the corporation's shareholders.  As set forth herein, the Individual Defendants breached their fundamental fiduciary duties by improperly favoring AEP's interests over Golfsmith's minority shareholders in connection with the Proposed Transaction. AEP and the Individual Defendants breached their fiduciary duties by failing to obtain a price for the Company that maximized shareholder value and, instead, accepted an unfairly low price for Golfsmith in order to further AEP's own objective of liquidating their interest in the Company.

29.     To diligently comply with their fiduciary duties, the Individual Defendants and AEP were obligated not to take any action that would:

(a)     adversely affect the value provided to the corporation's shareholders;

(b)     favor themselves to the detriment and expense of Golfsmith's minority shareholders, or that would discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibit them from complying with their fiduciary duties;

(d)     otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for *all* of the corporation's shareholders; and/or

(e)     provide them with preferential treatment at the expense of, or separate from, the minority shareholders.

30.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Golfsmith, are obligated to refrain from:

(a)     participating in any transaction where the directors or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

31.     Plaintiff alleges herein that the Individual Defendants and AEP, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and good faith owed to Plaintiff and the other minority shareholders of Golfsmith.

32.     The Individual Defendants and AEP also owe the Company's minority shareholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction, particularly as to the fairness of the low price at which the minority shareholders are being forced to sell their equity interest in the Company. Defendants are knowingly or recklessly breaching their fiduciary duties of candor by providing materially misleading information and by failing to disclose material information concerning the Proposed Transaction, thus depriving Golfsmith's minority shareholders of the ability to make an informed decision as to whether to accept the low price of $6.10 per share or to exercise their appraisal rights under Delaware law.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of Golfsmith common stock and their successors in interest, except Defendants and their affiliates (the "Class").

34.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of May 15, 2012, Golfsmith has approximately 15.9 million shares outstanding.

(b)     questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)     Have the Individual Defendants and/or AEP breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)     Have the Individual Defendants and/or AEP breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)     Have the Individual Defendants and/or AEP misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(iv)     Have the Individual Defendants and/or AEP breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(v)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic

alternatives including offers from interested parties for the Company or its assets;

(vi)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(vii)    Have Golfsmith, Golf Town, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(viii)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)    Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

(h)    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## FURTHER SUBSTANTIVE ALLEGATIONS

35.     Golfsmith is a specialty retailer of golf equipment and related apparel and accessories. The company operates as an integrated multi-channel retailer, offering its customers the convenience of shopping in 85 retail locations across the United States through its Internet site and from its assortment of catalogues.

36.     In a presentation given to investors on November 2, 2011, the Company noted its "significant growth opportunity" through store expansion, direct channel growth, and new businesses.

37.     In a press release dated January 25, 2012, the Company announced that it planned to open ten new stores and relocate four existing stores in 2012, moves that are expected to "expand [Golfsmith's] market share." The press release included the following statement:

> Golfsmith President and CEO Marty Hanaka commented, "We are excited to execute on our strategic growth plans with this aggressive store opening blueprint. We are well-positioned to capitalize on our excellent brand recognition and further expand our market share by opening stores in what we view as underserved markets that have strong demand. These locations are a hotbed for golfers and the key reason for entry into the markets. Everything we do is focused on helping golfers of all skill levels play better — that's our mission. The new stores will be funded by cash flow from operations."

> * * *

> "Our growth is directly traced to great product selection, guaranteed low prices on everything we sell and a commitment to exceptional customer service by the best retail professionals in the business. We are far more than a brick and mortar operation," Hanaka added. "We offer a true multichannel concept and Golfsmith.com continues to outperform our expectations as we successfully bring some of our retail concept to the web."

> "Golf and growth haven't gone hand in hand as of late. We've seen a major shift in the golf retail landscape with almost half of all golf stores in America closing in the last decade," said Terry McAndrew, editor of Web Street Golf Daily Pulse. "But Golfsmith, despite being in the minority of businesses willing to take risks and commit financial resources, has proven growth is still achievable regardless of the economic adversity."

38.     On March 1, 2012, the Company issued a press release announcing financial results for its fourth quarter and year ended December 31, 2011. For the quarter, the Company reported net revenues of $74.5 million, as compared to $72.8 million in fourth quarter 2010, and gross profit was $27.1 million, as compared to $23.3 million in fourth quarter 2010. For the year, the Company reported net revenues of $387.2 million, as compared to $351.8 million for 2010, and gross profits were $135.1 million, as compared to $119.5 for 2010. In the press release, defendant Hanaka stated, "[w]e have successfully executed on a number of key strategic initiatives over that last three years that we expect will enable us to achieve strong long term sales and earnings growth."

39.     That same day, the Company held a conference call with analysts to discuss the financial results for fourth quarter and the year ended December 31, 2011. In ending the call, defendant Hanaka stated, "[h]aving said that great year. It was a turnaround from a loss to a profit and we think we have got the momentum to keep that going all throughout 2012."

***The Proposed Transaction is Unfair.***

40.     In a press release dated May 14, 2012, the Company announced that it had entered into the Merger Agreement with Golf Town pursuant to which Golf Town, through Merger Sub, will acquire all of the outstanding shares of the Company for $6.10 per share.

41.     The adoption of the Merger Agreement required the affirmative vote or written consent of the holders of a majority of the Company's issued and outstanding shares of common stock. On May 11, 2012, AEP, Hanaka, and Gove, together owning approximately 51.1% of the 15,927,536 shares of Common Stock issued and outstanding on such date, each delivered a written consent adopting the Merger Agreement and authorizing the transactions contemplated by the Merger Agreement, including the Merger, among other things (collectively, the "Written

Consent"). As a result, no further action by any other Golfsmith stockholder is required to adopt the Merger Agreement or to authorize the transactions contemplated thereby.

42.     Golf Town is seeking to acquire the Company at the most opportune time, at a time when the Company is performing very well and is positioned for growth. As such, the Proposed Transaction consideration is inadequate and undervalues the Company.

43.     The *Selected Public Companies Analysis* conducted by Lazard Middle Market LLC ("Lazard") indicated an implied value per share range for the Company as high as $6.52 per share.

44.     The *Premia Paid Analysis* conducted by Lazard indicated a value of the Company as high as $7.76 per share.

45.     Moreover, according to Yahoo Finance, at least one Wall Street analyst had a price target of $7.50 per share when the Proposed Transaction was announced.

46.     In addition, the Proposed Transaction consideration fails to adequately compensate Golfsmith's shareholders for the significant synergies created by the merger. As stated in the press release announcing the Proposed Transaction:

> "Golfsmith is a company that we have admired for years. This transaction will give us a formidable footprint in North America and will also provide a strong platform for future growth," said Don Morrison, Senior Managing Director and Canadian Country Head of OMERS Private Equity. "Together with management we look forward to enhancing the value proposition for the companies' loyal customers."

> "We are extremely excited about this combination. Together, the businesses will have a broad multi-channel offering of retail, online, mobile and catalogue throughout North America," said Ron Hornbaker, interim CEO of Golf Town.

Despite the synergies inherent in the transaction for Golf Town, however, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Golf Town.

***AEP, Which Controls Golfsmith, is Attempting to Force a Sale of the Company to Further Its Own Objectives, at the Expense of Golfsmith's Disenfranchised Minority Shareholders.***

47.     AEP is the Company's controlling stockholder. As of February 28, 2012, AEP owned approximately 54% of the Company's outstanding common stock. According to the Information Statement, AEP owned approximately 52.9% as of June 2012.

48.     Five of the Company's ten directors are currently affiliated with AEP and one director was formerly affiliated with AEP. Specifically, Berglund has been a Managing Director of First Atlantic Capital, the management company of AEP, since 2004; Buaron has been the Chairman, President and Chief Executive Officer of First Atlantic Capital since he founded the firm in 1989; Grover joined First Atlantic Capital in 1998 and has been a Managing Director since 2007; Long has been a Senior Advisor for First Atlantic Capital since January 1, 2005; Pedroni has been with First Atlantic Capital since 2003 and has held the position of Principal since March of 2007; and Hardy served as an operating partner for an affiliate of First Atlantic Capital between August 2004 and January 2009.

49.     AEP commenced activities on September 28, 1999, with a ten-year term subject to extension for three additional one-year periods. The term of AEP has been extended for three years until September 28, 2012. Further extensions are available with the approval of a super majority of the limited partners in AEP.

50.     As stated in the Information Statement, "to date, an extension has not been requested." As further stated in the Information Statement, "due to the upcoming expiration of AEP's term, such directors affiliated with AEP may have an interest in creating a liquidity event prior to September 28, 2012."

51.     As a result of AEP's interests in liquidating their investment in Golfsmith, the interests of the Company's minority public shareholders were cast aside leading to a Proposed Transaction price that undervalues the Company and its true intrinsic value.

52.     In June 2011, the Board formed a Transaction Committee, consisting of directors *Hanaka, Buaron, Allen, and Flanagan* to "(i) manage and supervise the process of soliciting and considering potential business combinations or similar transactions involving a sale of all or a substantial portion of the assets or equity securities of Golfsmith (a 'Sale Transaction') on a day-to-day basis, with the advice and assistance of Golfsmith's counsel, (ii) to review and evaluate any proposals for Sale Transactions and, if the Transaction Committee deems advisable, to negotiate the terms and conditions of the best available Sale Transaction and (iii) to make recommendations to the Golfsmith Board with respect to any potential Sale Transaction arising from the conduct of the process described above."   Further, there is no indication that the Transaction Committee was authorized to consider any alternatives other than a sale of the Company.

53.     The Transaction Committee included defendant Buaron, the founder, Chairman, President and Chief Executive Officer of AEP's management company, who was included on the Transaction Committee to "ensur[e] that the views of AEP…with respect to any proposed transaction would be taken into account during negotiations." In addition, Hanaka, who was included on the Transaction Committee, ultimately accepted post-transaction employment opportunities with Golf Town. Accordingly, two of the four members of the Transaction Committee had material conflicts of interest, interests that did not align with the Company's public shareholders. During the process, those two members had to resign from the Transaction Committee, while still participating unofficially, Mr. Buaron had to leave the committee for

conflicts of interest once "alternative transaction structures" were pursued with the buyer that would discriminate against the minority shareholders.  Mr. Hanaka had essentially agreed, with the blessing of the buyer, to interim and post-closing employment, *while* the sales process of the company was still in progress, and was only placed on the committee after indicating that he did not intend to continue as an officer.

54.     The Transaction Committee failed to adequately negotiate with Golf Town and conceded to Golf Town throughout the negotiations, ultimately agreeing to a price well below the price originally sought by the Company. On August 23, 2011, Golf Town submitted an offer to acquire the Company at a range of $6.00 to $6.50 per share.  The Transaction Committee determined that the offer was "insufficient." The Company thereafter informed OMERS/Golf Town that it sought a "price level significantly in excess of Golf Town's proposed range."

55.     On August 30, 2011, OMERS delivered to the Company a revised indication of interest in the range of $7.50 - $8.50 per share.

56.     After conducting due diligence, on October 25, 2011, OMERS subsequently submitted a revised offer lowering their bid to $6.50 per share. In the revised bid, OMERS also indicated "a requirement that Golfsmith's senior management agree to reinvest 50% of their after-tax proceeds from the transaction and enter into employment agreements with Golf Town."

57.     On October 27, 2011, the Transaction Committee met and determined to inform OMERS that the Transaction Committee was not prepared to recommend the bid by OMERS, but that it would be prepared to recommend a transaction at a price of $7.50 per share (subsequently increased to $7.75 per share).  After OMERS immediately rejected the $7.75 bid, the Transaction Committee lowered its offer to $7.00 per share. After OMERS immediately

rejected that bid also, the Transaction Committee determined that it would continue to negotiate with OMERS/Golf Town at the $6.50 per share level.

58.     Thereafter, in November 2011, Golf Town began meeting with members of Golfsmith's senior management to negotiate the terms of their participation in management of the combined company. As described in the Information Statement, during November and December 2011, Hanaka, Gove, Larkin, and Getson negotiated for themselves future employment and/or equity participating in the post-transaction Golf Town/Golfsmith entity described in more detail below.

59.     In January 2012, OMERS subsequently lowered their bid and the parties ultimately agreed to a price of $6.10 per share. The $6.10 price is at the very low end of the $6.00 to $6.50 price range that the Company originally determined was insufficient, and well below the $7.50-$7.75 price range the Company sought to receive during its negotiations. Rather than terminating discussions and remaining a stand-alone entity, the Board entered into the deal at an unfair price to satisfy AEP's need for liquidation.

60.     The Transaction Committee provided on September 27, 2011 "competitively sensitive data of Goldsmith" to OMERS, that it does not seem to have provided Bidder B or C.

61.     Furthermore, the Company egregiously, in response to an additional reach out by Bidder B on "February 10, 2011" (sic) regarding their $6.50 potential offer price, had Mr. Hanaka, who had already accepted employment with OMERS and Golf Town, respond to Bidder B's CEO, who had now reached out to Golfsmith multiple times only to be rebuffed with no information as to what was happening with the process, and granted OMERS de facto exclusivity through the entire 2012.

*Golfsmith's Officers and Directors Obtained Special Benefits for Themselves.*

62.    In addition to AEP's conflicts, the Company's executive officers also have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Golfsmith's public shareholders.

63.    First, members of Golfsmith's management team will be employed by the combined company after the Proposed Transaction is completed.

64.    As described in the Information Statement, simultaneously with the execution of the Merger Agreement, OMERS entered into non-binding letter agreements with each of Hanaka, Gove, Larkin, and Getson, with respect to such employee's employment by Golfsmith upon the closing of the Proposed Transaction. Each of the non-binding letter agreements provide for base salaries well in excess of what is currently being received by each of Hanaka, Gove, and Larkin (the current base salary of Getson is unknown), as well as substantial bonus opportunities.

65.    As further described in the Information Statement, "it is intended that Mr. Hanaka will serve as Chief Executive Officer of the combined Golf Town and Golfsmith business post-Merger during the transitional period from the closing of the Merger until and including December 31, 2012." Then, "OMERS anticipates that Golf Town and its affiliates will offer Ms. Gove the position of Chief Executive Officer beginning on January 1, 2013, following a transition period expected to last until December 31, 2012." Assuming a successful transition, and subject to the mutual agreement of the combined Golf Town and Golfsmith business and Ms. Gove, the combined Golf Town and Golfsmith business anticipates offering Ms. Gove, as Chief Executive Officer, a base salary of $700,000, a target annual bonus set at 100% of base salary, and a special grant of options in the amount of $1,080,000. Should Ms. Gove not assume

such position at that time for reasons other than for cause, Golf Town or one of its affiliates will purchase Ms. Gove's shares at the greater of cost or fair market value.

66.     In addition, the non-binding letter agreements for Larkin, Getson and Gove "contemplate the future establishment of an option plan and a subsequent grant of incentive equity awards in the form of stock options, 50% of which vest over a 4-year period (with 20% of such time-based options vesting on the date of grant, and an additional 20% vesting each year thereafter until year 4) and 50% of which vest based on the combined Golf Town and Golfsmith business's achievement of annual EBITDA targets to be set by the Board of Directors of the combined Golf Town and Golfsmith business." The size of the option plan "will be approximately $7,500,000, representing approximately 3.6% of the estimated $208,000,000 equity value of the combined Golf Town and Golfsmith business." OMERS and Golf Town and its affiliates expect that Ms. Gove will be the most significant participant in this program, with an initial allocation of approximately 29% of the pool ($2,170,000), representing approximately 1% of the equity value of the combined Golf Town and Golfsmith business. If Ms. Gove becomes Chief Executive Officer, she will receive an additional option grant of $1,080,000. Mr. Getson and Mr. Larkin will receive an initial allotment of 5.3% of the pool ($400,000 each), representing approximately 0.2% of the equity value of the combined Golf Town and Golfsmith business.

67.     Moreover, Gove is expected to reinvest $484,767 in the combined Golf Town and Golfsmith business, which will represent approximately 0.2% of its equity value. In addition to direct ownership purchased via such investment, Gove's ownership level will be additionally increased through a one-time grant of equity of the combined Golf Town and Golfsmith business upon completion of the Proposed Transaction, in an amount to be mutually determined.

68.     Getson is expected to invest an amount equal to 50% (approximately $50,000) of Mr. Getson's after-tax proceeds from the Proposed Transaction, in respect of any stock options and performance share awards owned by Getson. Such investment will purchase approximately 0.02% of the equity value of the combined Golf Town and Golfsmith business. In addition to direct ownership purchased via such investment, Getson's ownership level will be increased through a one-time grant of common stock of the combined Golf Town and Golfsmith business upon completion of the Proposed Transaction, in an amount to be mutually determined.

69.     In addition, certain of the Company's officers, including defendant Hanaka, currently hold unvested stock options of the Company. Pursuant to the terms of the Merger Agreement, stock options to acquire Golfsmith common stock will be cancelled and converted into the right to receive the excess of the merger consideration over the per share exercise price of the option.  As stated in the Information Statement, Golfsmith's executive officers will receive $1.6 million from options that will automatically vest as a result of the Proposed Transaction.

70.     Based on the above, the Proposed Transaction reflects an effort by the Individual Defendants, the Company's officers, and AEP to aggrandize their own financial position and interests at the expense of, and to the detriment of, Golfsmith's public shareholders.

*The Preclusive Deal Protection Devices*

71.     As part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

72.     Section 5.2(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Golf Town. Section 5.2(a) demands that the Company

terminate any and all prior or on-going discussions with other potential acquirers and includes a provision whereby Golfsmith will not waive a standstill agreement.

73.     Pursuant to § 5.2(b) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Golf Town of the bidder's identity and the terms of the bidder's offer. Pursuant to § 5.2(c), should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Golf Town in order to enter into the competing proposal, it must grant Golf Town three business days in which the Company must negotiate in good faith with Golf Town (if Golf Town so desires) and allow Golf Town to amend the terms of the Merger Agreement to make a counter-offer so that the "Alternative Transaction would cease to constitute a Superior Proposal." In other words, the Merger Agreement gives Golf Town access to any rival bidder's information and allows Golf Town a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Golf Town and piggy-back upon the due diligence of the foreclosed second bidder.

74.     The Merger Agreement also provides that a termination fee of $3.8 million must be paid to Golf Town by Golfsmith if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

75.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that

constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

76.     As described above, AEP's interests are in conflict with those of Golfsmith's minority stockholders.  Yet, the Merger Agreement does not contain a majority-of-the-minority voting provision, thus enabling AEP and the Company's officers themselves to approve the Proposed Transaction as it has done through the Written Consent. Because of AEP's conflicting interests, the Merger Agreement should at least have provided for a vote by *all* of Golfsmith's shareholders with a majority-of-the-minority voting provision. Since the Merger Agreement does not contain any such provision or other mechanism to protect the interests of Golfsmith's minority shareholders, judicial intervention is required.

77.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that he and the Company's other minority shareholders will continue to suffer absent judicial intervention.

***The Materially Misleading and Incomplete Information Statement***

78.     To make matters worse, defendants are withholding material information about the Proposed Transaction from Golfsmith's public shareholders. As discussed below, the Information Statement provides Golfsmith's minority shareholders with materially misleading information and omits material facts, thereby rendering minority shareholder unable to make an informed decision about whether to accept the low $6.10 price or to exercise their appraisal rights under Delaware law.

79.     The Information Statement fails to disclose material information concerning the financial forecasts of the Company. In particular, the Information Statement:

(a)      Fails to disclose the "free cash flow" forecasts of the Company for years 2012 through 2015 derived by Lazard in its Discounted Cash Flow Analysis;

(b)      Fails to disclose the projections used for the first half of 2012 as used in the Discounted Cash Flow Analysis but not disclosed in the financial projections;

(c)      Fails to disclose the projected tax rates for fiscal years 2012 through 2015;

(d)      Fails to disclose the treatment of any net operating losses in the valuation analyses given that the Company had large NOL's of 26.6 million reported in its latest 10k.

(e)      Fails to provide any synergy analyses provided to Lazard;

(f)      Fails to provide any explanation why the updated 2012 projections provide higher top-line growth for the entire projection period, but lower EBITDA and EBIT projections, in comparison to the 2011 projections as to the duration of the projection periods;

(g)      Fails to disclose the "other data" and "certain sensitivities" to the forecasts that were provided to Lazard by Golfsmith as indicated on page 50 of the Information Statement; and

(h)      Fails to disclose the assumptions used by Company management in preparing the forecasts.

80.      The Information Statement fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, Lazard, including:

(a)      with respect to the *Discounted Cash Flow Analysis*, the definition of "free cash flows" used by Lazard in the analysis, the manner in which Lazard calculated the Company's terminal value including the multiples and/or growth rates used to calculate the terminal value, and the key inputs used by Lazard for choosing an after-tax discount rate range of

17.2% to 19.2%, including the weighted average cost of capital observed for the comparable companies;

       (b)    with respect to the *Discounted Cash Flow Analysis*, what terminal value method was used, and what calculations and inputs were used for that critical aspect of the analysis;

       (c)    with respect to the *Selected Public Companies Analysis*, the criteria used to determine the companies that were deemed "similar" to the Company, and the reasons for choosing the reference ranges of 6.2x to 8.6x for enterprise value to LTM EBTIDA, 5.2x to 7.3x for enterprise value to 2012 estimated EBTIDA, 15.1x to 16.0x for share price to LTM EPS, 13.1x to 13.8x for share price to 2012 estimated EPS, and Golfsmith's multiples at the offer price;

       (d)    with respect to the *Precedent Transactions Analysis*, the criteria for selecting the transactions reviewed, as well as the reasons for choosing reference range of 7.4x to 8.6x to Golfsmith's LTM ended March 31, 2012, adjusted EBITDA and Golfsmith's multiples at the offer price;

       (e)    With respect to the *Premia Paid Analysis*, the reasons for applying the range of 27.2% to 64.8% to Golfsmith's closing stock price for May 10, 2012, and February 29, 2012.

       81.    The Information Statement also fails to disclose any information pertaining to AEP's reasons for entering into the Proposed Transaction. The Information Statement must disclose what factors were considered by AEP in determining to enter into the Proposed Transaction. The Information Statement must also provide more detail regarding the upcoming September 28, 2012, expiration of AEP's partnership, including whether AEP intended to file an

extension of its partnership or whether AEP intends to liquidate prior to September 28, 2012. This information is material in determining AEP's motives in agreeing to the Proposed Transaction.

82.     The Information Statement states that "LFC [Lazard's parent] and its affiliates (including LMM) in the past (but not within the past two years) may have provided certain other investment banking services to Golfsmith, certain of Golfsmith's affiliates, OMERS, Golf Town and certain of Golf Town's affiliates, for which LFC and its affiliates have received compensation." The Information Statement must disclose the nature/terms of the services provided, the dates of the services, and the amount of compensation received for such services.

83.     The Information Statement states that Gove and Getson's "ownership level will be additionally increased through a one-time grant of common stock of the combined Golf Town and Golfsmith business upon completion of the Proposed Transaction, in an amount to be mutually determined," but fails to disclose what factors will be considered in determining the amount by which their ownership level will increase, as well as whether there is a minimum or maximum amount that has been agreed to.

84.     The Information Statement also fails to disclose material information concerning the events leading up to the announcement of the Proposed Transaction. In particular, the Information Statement:

(a)     Fails to disclose what the "rollover alternatives" were and what the "potential alternative transaction structure that was ultimately not pursued was", why that forced Mr. Bauron to resign from the Transaction Committee, and why Mr. Bauron was on the Committee initially;

(b)     Fails to disclose the reasons the Transaction Committee was not authorized to pursue any alternatives other than a sale of the Company;

(c)     Fails to disclose the reasons for not ensuring that a majority of the Transaction Committee did not have potential conflicts of interest;

(d)     Fails to disclose the reasons the Board "determined not to pursue [Golf Town's] overture" during the fall of 2010, and the reasons the Board "determined that it would be appropriate to pursue further discussions" with Golf Town in February 2011;

(e)     Fails to disclose the criteria used to select Buaron, who was tied to the majority shareholder AEP, to oversee the task of retaining a financial advisor;

(f)     Fails to disclose the criteria for appointing Allen as chairman of the Transaction Committee;

(g)     Fails to disclose whether the information the Transaction Committee provided to OMERS on September 27, 2011 that "competitively sensitive data of Goldsmith" . . . "that OMERS could factor into its valuation analysis" was provided to Bidders B and C;

(h)     Fails to disclose what the financial information and "certain factors that had contributed to recent weakness in Golfsmith's financial performance" were, and what was the "highlighted information that would support a higher bid and reinforce the value of Golfsmith";

(i)     Fails to disclose At the December 5, 2011 meeting the basis of "Mr. Bauron expressed [] desire to contact OMERS on behalf of AEP as a stockholder to exert pressure for a higher price in light of Golf Town's reliance on Golfsmith's management team and OMERS's high yield financing plans which suggested to AEP that OMERS would be

willing to provide additional value to Golfsmith's shareholders," and why no such contact was made for over a month even though he was authorized to do so;

(j)     Fails to disclose What Bidder B was told about the process when "promptly following the public announcement by Golf Town of the departure of their Chief Executive Officer," as to whether the Company was still for sale;

(k)     Fails to disclose The nature of the "identified EBITDA shortfall as mentioned in December, and the basis of Mr. Bauron's January 7, 2012 call asking that OMERS consider a price increase based on "Golfsmiths overall financial performance"

(l)     Fails to disclose what is meant by "Golfsmith's recent financial progress" at the January 17, 2012 meeting in light of the conversation on December 14, 2011 regarding what is described as "Golfsmith's recent underperformance as compared to forecasted EBITDA";

(m)     Fails to disclose the criteria used to select the 62 potential bidders that were contacted, as well as who created the list of potential bidders;

(n)     Fails to disclose how many of the 30 potential bidders that entered into confidentiality agreements were strategic parties, and how many were financial bidders;

(o)     Fails to disclose the price per share that Bidder C's August 23, 2011 offer equated to;

(p)     Fails to disclose the criteria considered by the Transaction Committee in determining that Golf Town's $6.00-$6.50 per share offer was "insufficient;"

(q)     Fails to disclose the information that would support a higher bid as discussed on October 17, 2011;

(r)     Fails to disclose the reasons provided by OMERS for reducing their offer from $7.50-$8.50 per share to $6.50 per share on October 25, 2011;

(s)     Fails to disclose the value of Bidder C's October 25, 2011 offer;

(t)     Fails to disclose the "position of Bidder C" as discussed by the Transaction Committee on October 27, 2011;

(u)     States that on October 27, 2011, the Transaction Committee met and determined that it "was not prepared to recommend the bid by OMERS, but that it would be prepared to recommend a transaction at a price of $7.50 per share (subsequently increased to $7.75 per share following further discussions among Lazard and the members of the Transaction Committee following the meeting)." The Information Statement must disclose what factors were considered by the Transaction Committee in determining to counteroffer at a $7.50 price, and then subsequently at the $7.75 price;

(v)     Fails to disclose the "valuation concerns with OMERS's bid" discussed by the Transaction Committee on October 27, 2011;

(w)     Fails to disclose the factors considered by the Transaction Committee in determining to counteroffer at a price of $7.00 per share on November 1, 2011;

(x)     Fails to disclose whether the Company contacted the competitor that sought Golfsmith's interest in a possible acquisition of the competitor on November 17, 2011, following the expiration of the exclusivity agreement with Golf Town, and if not, the reasons for not doing so;

(y)     Fails to disclose "OMERS's concern[s] with the identified EBITDA shortfall," the "possible explanations" as well as the "potential impact on the negotiations with OMERS" discussed by the Transaction Committee on December 16, 2011; and

(z)      States that on February 10, 2011, Hanaka "called the chief executive officer of Bidder B to explore Bidder B's interest in acquiring Golfsmith at a cash price of $6.50 per share" and that the chief executive officer of Bidder B "inquired about how long Mr. Hanaka would be willing to remain in the chief executive officer role at Golfsmith." The Information Statement should disclose whether Hanaka explored with Bidder B a price below $6.50 per share, and if not, the reasons for not doing so, as well as what Hanaka told Bidder B with respect to his willingness to remain as CEO of Golfsmith.

85.      Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

### CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(c) of
### the Exchange Act
### (Brought Individually Against Golfsmith and the Individual Defendants)

86.      Plaintiff repeats all previous allegations as if set forth in full herein.

87.      Pursuant to Section 14(c) of the 1934 Act, the Company's Information Statement must provide information that is substantially equivalent to the information required to be provided by a solicitation.

88.      Rule 14c-6, promulgated by the SEC pursuant to Section 14(c) of the Exchange Act, provides that an information statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the same meeting or subject matter which has become false or misleading." 17. C.F.R. § 240.14c-6(a).

89.     The Information Statement violates Section 14(c) and the rules promulgated thereunder because it omits material information and/or provides materially misleading information including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Information Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

90.     The misrepresentations and omissions in the Information Statement are material to Plaintiff and Golfsmith's public shareholders who will be deprived of their ability to make an informed decision on whether to seek appraisal for their shares.

91.     As a result, Plaintiff and the Company's public shareholders are being harmed.

92.     Plaintiff has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duties**
**(Against All Individual Defendants)**

93.     Plaintiff repeats all previous allegations as if set forth in full herein.

94.     As directors of Golfsmith, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of good faith, loyalty and care. The Individual Defendants' recommendation and effectuation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Golfsmith's value for the benefit of *all* of the Company's stockholders and requires enhanced scrutiny by the Court.

95.     As discussed herein, the Individual Defendants have breached their fiduciary duties to Golfsmith's minority shareholders by, *inter alia*, failing to engage in an honest and fair sale process, failing to maximize shareholder value and by improperly favoring AEP's interests

over those of the Company's minority stockholders and by allowing the unfair Proposed Transaction to proceed without a vote and without any majority-of-the-minority voting provision.

96.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Golfsmith's assets and will be prevented from benefiting from a value-maximizing transaction.

97.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction to the irreparable harm of Plaintiff and the Class.

98.     Plaintiffs and the Class have no adequate remedy at law.

**COUNT III**
**Breach of Fiduciary Duty**
**(Against AEP)**

99.     Plaintiff repeats all previous allegations as if set forth in full herein.

100.    As the majority stockholder of the Company exercising actual control over the Company's business affairs, and with its representatives holding five of the ten seats on the Company's Board, AEP owed fiduciary duties to Plaintiff and the Company's other minority shareholders.  AEP violated its fiduciary duties in its efforts to sell the public shareholders' stake in the Company for wholly inadequate and unfair consideration and without any majority of the minority voting provision.

101.    AEP has the control power and is exercising such control power to sell Golfsmith's public shares and dictate terms that are in its own interest without regard to the best interests of Plaintiff and other Golfsmith minority shareholders, without establishing the fair

market value of Golfsmith's shares, and without a shareholder vote or majority-of-the-minority voting provision.

102.    AEP has breached and will continue to breach its fiduciary duties owed to the public shareholders of Golfsmith, and is engaging in, or facilitating the accomplishment of, an unfair and self-interested transaction that is highly unfair to the public shareholders of Golfsmith and is being done without a vote by minority shareholders and without any majority-of-the-minority voting provision.

103.    As a result of AEP's breaches of its fiduciary duties, Plaintiff and the Class will suffer irreparable injury.

104.    Unless enjoined by this Court, AEP will continue to breach its fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

105.    Plaintiff and the Class have no adequate remedy at law.

**COUNT IV**
**Breach of Fiduciary Duty – Disclosure**
**(Against AEP and the Individual Defendants)**

106.    Plaintiff repeats all previous allegations as if set forth in full herein.

107.    The fiduciary duties of AEP and the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Golfsmith's shareholders.

108.    As set forth above, AEP and the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

109.    As a result, Plaintiff and the Class members are being harmed irreparably.

110.    Plaintiff and the Class have no adequate remedy at law.

**COUNT V**
**Aiding and Abetting**
**(Against Golf Town and Merger Sub)**

111.   Plaintiff repeats all previous allegations as if set forth in full herein.

112.   As alleged in more detail above, Defendants Golfsmith, Golf Town, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

113.   As a result, Plaintiff and the Class members are being harmed.

114.   Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)   declaring this action to be a class action with respect to Plaintiff's state law claims and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)   enjoining, preliminarily and permanently, the Proposed Transaction;

(C)   in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)   directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)   awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)   granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Daniel W. Jackson*

Daniel W. Jackson, SBN 00796817
S.D. of Texas No. 20462
3900 Essex Lane, Suite 1116
Houston, Texas  77027
(713) 522-4435
(713) 527-8850 – fax
daniel@emmonsjackson.com

Attorney-in-charge for
Plaintiff Benjamin Fleener